```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
Amy Emery,                                      :
                                                :
                Plaintiff,                      :
                                                :         **MEMORANDUM & ORDER**
        -against-                               :
                                                :         05-CV-1358 (DLI)
Commissioner of Social Security,                :
                                                :
                Defendant.                      :
-----------------------------------------------------------------x
```

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Amy Emery filed an application for disability insurance benefits and supplemental security income payments under the Social Security Act on June 28, 2002. Plaintiff's application was denied initially and on reconsideration. Plaintiff testified at a hearing held before an Administrative Law Judge ("ALJ") on February 9, 2004. By decision dated March 22, 2004, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act. On February 11, 2005, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. Pursuant to Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings, affirming her determination that plaintiff was not disabled because she had the residual functional capacity to perform a significant range of light work. Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, to remand. For the reasons stated below, defendant's motion is denied and plaintiff's motion is granted to the extent that the case is remanded to the Commissioner of Social Security for further proceedings.

## I.  Summary of Facts

*Medical Evidence*

Plaintiff claims that her illness began in January 2001, after which she began seeking medical attention.  Plaintiff testified that she was unable to continue working after April 15, 2002, due to "recurring headaches, dizziness, . . . lightheaded[ness,] . . . . being overwhelmed, and also having short-term memory loss."  (Admin. R. at 232.)  On May 2, 2002, plaintiff was diagnosed with a brain tumor at Beth Israel Health Care Hospital, after experiencing fainting spells, nausea, vomiting, and headaches.  The next day plaintiff underwent brain surgery.

On May 16, 2002, plaintiff saw Dr. Eric Elowitz, her treating neurologist, for a follow-up visit.  Dr. Elowitz reported that plaintiff was "doing very well following surgery," and "the wound is healing well and she is walking quite well."  (Admin. R. at 162.)  On June 11, 2002, Dr. Elowitz again reported that plaintiff "continues to do well without any complaints" and that he was "satisfied with her progress."  (Admin. R. at 161.)

On June 17, 2002, plaintiff met with Dr. Andrew Dalsimer, a psychiatrist, for an assessment of possible depression following brain surgery.  Dr. Dalsimer found plaintiff to be depressed, tearful, anxious, overwhelmed and had become reclusive due to her trouble being with people.  Her concentration was impaired and she was both physically and emotionally unable to tolerate a working environment.

On September 5, 2002, plaintiff saw Dr. Harvey Barash, a specialist in psychiatry and neurology, and was diagnosed with depressive disorder.  Dr. Barash reported that plaintiff had no history of psychiatric hospitalizations but that she had been seeing a therapist for over two years due to family and other personal problems.  Plaintiff stated her depression had worsened since the

surgery, and that she sees a therapist weekly and had begun seeing a psychiatrist monthly, who prescribed 20 mg of Celexa per day.[1] Dr. Barash noted that plaintiff came to the interview by train unaccompanied and that her manner was both polite and cooperative. He found plaintiff's thought processes to be coherent and goal directed without flights of ideas or loosening of associations. Dr. Barash reported that plaintiff's comprehension, memory and concentration were all fair. However, Dr. Barash reported that her adaptability appeared limited by some reduced tolerance for stress and that she continues to have depressive complaints.

In October 2002, Dr. Juan Echevarria, a State Agency physician specializing in psychiatry, prepared a psychiatrist review of plaintiff. He reported that plaintiff's depressive syndrome was characterized by pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance, psychomotor agitation and retardation and decreased energy. Dr. Echevarria found that plaintiff had no restriction on activities of daily living, slight difficulties in maintaining social functioning, seldom deficiencies in maintaining concentration, persistence or pace, and never repeated episodes of deterioration.

Also in October 2002, Dr. Echevarria performed a mental residual functional capacity assessment. He found that neither plaintiff's ability to remember locations and work-like procedures, nor her ability to understand and remember very short and simple instructions were significantly limited. However, he found that plaintiff's ability to understand and remember detailed instructions and to carry out very short and simple or detailed instructions were moderately limited.

Dr. Echevarria further reported that plaintiff's ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be

---

[1]Celexa is used for the treatment of depression. THE PILL BOOK 213 (9th ed. 2000).

3

punctual within customary allowances, to sustain an ordinary routine without special supervision, to work in coordination with and close proximity to others without being distracted by them, and to make simple work-related decisions were not significantly limited. Dr. Echevarria noted that plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were not significantly limited. Dr. Echevarria found that plaintiff's ability to ask simple questions or request assistance, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others were not significantly limited. However, plaintiff's ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors were moderately limited.

On November 12, 2002, Dr. Steven Ertec, P.h.D. administered the Wechsler Adult Intelligence Scale ("WAIS") and the Bender Motor Gestalt Test ("BMG") on plaintiff. The WAIS revealed a verbal IQ of 101, an above average score. However, Dr. Ertec reported that plaintiff was below the mean in her ability to perform mental calculations and in her immediate recall of sequenced numbers. Dr. Ertec reported that plaintiff possesses cognitive and academic skills, sufficient for maintaining herself in an independent work-related environment. He further reported that while her interpersonal skills appear to be good, she experiences considerable anxiety, depression and general difficulties in terms of her readjustment following brain surgery. According

4

to Dr. Ertec, plaintiff is expected to make a full readjustment to an independent work-related environment, although she has presently not yet done so, and her prognosis is excellent in the absence of further medical difficulties.

In December 2002, a State agency medical consultant reviewed the medical evidence and opined that plaintiff is capable of executing simple routine tasks and that the evidence did not substantiate the presence of marked psychiatric limitations. The State medical consultant reported that plaintiff can understand, remember and execute simple instructions; sustain concentration, persistence and pace; socially interact adequately; and adapt to change.

On July 9, 2003, plaintiff again met with Dr. Dalsimer. He found that plaintiff was still struggling with fatigue, was anxious and became tearful when discussing her surgery. He noted that she was more relaxed but still dysphoric and "not ready to resume her normal activities." (Admin. R. at 196.) Plaintiff reluctantly accepted a trial of Celexa. During plaintiff's July 21, 2003 visit, Dr. Dalsimer suggested that plaintiff was experiencing a posttraumatic reaction to the surgery.

Plaintiff began seeing a therapist, Melina Kavakov, in 2000, and met with her on a weekly basis up until plaintiff's hearing before the ALJ. The therapist initially treated plaintiff for her lack of confidence and plaintiff "saw [her] through the time that [plaintiff] was sick . . . . so . . . [Ms. Kavakov has] been very helpful." (Admin. R. at 236.)

*Plaintiff's Benefits Application and Testimony*

Plaintiff is currently thirty-eight years old and was thirty-five when she appeared *pro se* at the hearing before the ALJ on February 9, 2004. From September 1990 through June 2002, plaintiff, a college graduate, worked as a personal assistant, art therapist, cashier, customer service representative, computer worker, printer, sales associate, rehabilitation teacher, waitress, and English

5

teacher. Most recently, plaintiff worked as an art therapist at the Long Island College Hospital. Plaintiff testified that she was unable to work following the surgery on May 3, 2002, due to headaches, short-term memory problems, light-headedness, dizziness, feeling overwhelmed, and balance problems. She tried returning to work for four days in June 2002 but "became very sick afterwards . . . and . . . was told that it was too premature to return." (Admin. R. at 230.) However, in January 2004, plaintiff began seeking part-time work and testified that she "really want[s] to get back to work, and [she] can, depending on what the job tasks are." (Admin. R. at 231; 243.)

According to plaintiff, she is able to read, shop, watch television, prepare meals, do laundry, take care of her own personal needs, send emails, draft cover letters, play the banjo, and handle social situations "ok." (Admin R. at 241.) However, she testified that she continues to suffer headaches three times a month that last three days at a time. She takes over-the-counter medication for her headaches because she does not like taking prescription medicine, and she is no longer taking Celexa. Plaintiff also testified that she feels dizzy on occasion, and that she fell five times prior to her surgery and two times since her surgery. Plaintiff's husband, Alexander Kriseman, testified that since the surgery, plaintiff no longer has nausea and vomiting but that she suffers from headaches "pretty often." (Admin. R. at 248.) Mr. Kriseman also testified that plaintiff's condition gets worse when she is stressed.

*Vocational Expert Testimony*

The ALJ also heard testimony from an impartial vocational expert, Fred Siegel, to determine whether jobs exist in significant numbers in the national economy that plaintiff could perform. The ALJ posed the following set of factors as a hypothetical to Mr. Siegel: (1) a thirty-three to thirty-five year old individual; (2) with twelve-plus years of education; (3) past work experience as an art

6

therapist, retail store cashier, customer service, computer worker, printer, waitress, rebahilitation teacher, and English teacher; (4) no exertional impairments, but can never climb a ladder or scaffold; (5) must avoid all exposure to unprotected heights and hazards; (6) moderately limited in the ability to understand, remember and carry out detailed job instructions; (7) moderately limited in the ability to carry out very short, simple instructions; (8) moderately limited in the ability to interact appropriately with the general public; (9) moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors; (10) able to perform simple, routine tasks in a low-stress environment with only limited contact with the public and co-workers; and (11) only occasional contact with the public and co-workers. In response, Mr. Siegel testified that the hypothetical individual could perform "light, unskilled work"[2] such as an assembler of plastic parts, of which there are 110,000 jobs nationally and 5,500 in the New York metropolitan area, a ticket taker, of which there are 35,000 jobs nationally and 1,000 in New York, and a fast food worker, of which there are 500,000 jobs nationally and 15,000 in New York. (Admin. R. at 252-53.) However, Mr. Siegel testified that if the hypothetical person had headaches lasting for three days at a time, sufficient to affect her functioning, she would not be employable.

*The ALJ's Decision*

In a written decision dated March 22, 2004, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act and, therefore, was not entitled to either disability

---

[2]"Light works involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

7

insurance benefits or supplemental security income payments. The ALJ utilized the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 to reach his conclusion The ALJ resolved step one in plaintiff's favor because she had not performed substantial gainful activity during the relevant period. At step two, the ALJ found that plaintiff's impairments – depression and anxiety – were "severe" as defined by the Social Security Act. However, the ALJ noted that the residuals of plaintiff's brain surgery were nondurational, did not continue to cause more than minimal limitations and were nonsevere. In support, the ALJ cited: (1) the report by Dr. Elowitz, plaintiff's treating physician, stating that plaintiff's wound was healing well and that he was "satisfied with her progress"; (2) the testimony of both plaintiff and her husband that she was doing better; and (3) Dr. Ertec's report stating that plaintiff's prognosis was excellent in the absence of further medical difficulties. (Admin. R. at 161.) The ALJ next concluded at step three that plaintiff's impairments, either alone or in combination, were not sufficiently "severe" to meet or equal an impairment listed in Appendix 1. The ALJ noted that while plaintiff was moderately limited in her "social functioning" and "concentration, persistence and pace," she was not limited in "activities of daily living," or "deterioration or decompensation in work or work-like settings." (Admin. R. at 15-16.)

The ALJ next analyzed plaintiff's "residual functional capacity." Under step four, the ALJ concluded that plaintiff was unable to perform past relevant work due to nonexertional limitations, which include a moderately limited ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods of time, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from superiors. However, the ALJ found that plaintiff was able to perform simple routine tasks in a low stress environment with only limited contact with the public and co-workers. The ALJ noted

that the burden then shifted to the Social Security Administration to show that plaintiff could perform other work consistent with her age, education and work experience. At step five, the ALJ found that while plaintiff's nonexertional limitations did not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for his decision, plaintiff was capable of performing jobs that exist in significant numbers in the national and regional economy, such as assembler of plastic parts, ticket taker and fast food worker. In doing so, the ALJ rejected the vocational expert's testimony that a hypothetical individual with headaches lasting for three days at a time was not employable because the ALJ did not find plaintiff's subjective complaints of headaches and dizziness credible.

## II. Discussion

### A. Standard of Court Review

In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record,

a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases). A remand to the Commissioner is also appropriate "where there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)).

**B. Standards Governing Evaluation of Disability Claims by ALJ**

An individual is "disabled" under the Social Security Act where there is "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof of showing disability by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5); *see also Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. § 404.1520, there is a five-step process whereby the ALJ determines disability under the Social Security Act. If at any step, the ALJ makes a finding that the claimant is either disabled or not disabled, the inquiry ends there. At the first step, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a severe impairment, without

reference to age, education, or work experience. To be considered disabled, the claimant must have an impairment, or combination of impairments, which significantly limits his or her physical or mental ability to do basic work activities, satisfying the durational requirement in § 404.1509. 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[3] 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five. 20 C.F.R. § 404.1520(e). The "residual functional capacity" is "the most [the claimant] can still do despite . . . limitations." 20 C.F.R. § 404.1545(a). The ALJ considers all of the claimant's impairments and symptoms, including pain, that may cause physical or mental limitations. *Id*. In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work which exists in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to show that the claimant could perform the other work. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

**C. The ALJ Improperly Found Plaintiff's Subjective Complaints Not Credible**

Plaintiff testified at the hearing that she was unable to work because she suffers from headaches, dizziness, light-headedness, impaired short term memory, difficulty balancing and a sense of being overwhelmed. Plaintiff contends that the ALJ misrepresented the record in finding these subjective complaints not credible. The court agrees. The ALJ lists eight factors in support

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

of his view that plaintiff's subjective complaints were not credible: (1) plaintiff began looking for a job in January 2004; (2) plaintiff's treating neurologist only required follow-up visits at five year intervals; (3) Dr. Ertec's opinion that plaintiff's prognosis was good absent further medical difficulties; (4) plaintiff married in February 2003; (5) plaintiff only takes over-the-counter medication; (6) the lack of evidence that plaintiff's slow recovery was not to include work activity; (7) no evidence of seizures; and (8) Dr. Barash's notation that plaintiff came to the interview unaccompanied by train. In declining to accord plaintiff full credibility, the ALJ rejected the vocational expert's conclusion that plaintiff was not employable given that she suffers from headaches lasting three days at a time. The ALJ then found plaintiff not disabled because she retained the residual functional capacity to perform light exertional work with certain nonexertional limitations.

Although it is clearly permissible for an administrative law judge to evaluate the credibility of an individual's allegations of pain, this independent judgment should be arrived at in light of all the evidence regarding the extent of the pain. *See Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979). The adjudicator must consider the "entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *See* SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996); *Rivera v. Schweiker,* 717 F.2d 719, 724 (2d Cir. 1983). However, subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other objective medical evidence. *See Marcus,* 615 F.2d at 27.

It is clear that the ALJ herein did not follow this standard. The ALJ's reliance on plaintiff's testimony regarding her desire to work is misplaced because the ALJ failed to distinguish between full-time and part-time work. The ability to perform part-time work does not preclude a finding of disability at step five because the relevant concept at step five is the residual functional capacity to perform work on a "regular and continuing basis," which means eight hours a day, five days a week, or an equivalent work schedule. *See Kelley v. Apfel,* 185 F.3d 1211, 1214 (11th Cir. 1999) ("In other words, at step five, the government's present representation is that only an ability to do full-time work will permit the ALJ to render a decision of not disabled."); SSR 96-8p.[4] Here, plaintiff testified that she first began seeking work in January 2004, notably over a year and a half after her surgery. However, even then, she only sought work on a part-time basis, because she "[didn't] have the stamina to go [to a job] every day [but she] want[ed] to . . . begin part time at a job that [she] can . . . handle and do well." (Admin. R. at 231-32.) Furthermore, the ALJ's reliance on the lack of evidence indicating seizures in the record simply lacks relevancy because plaintiff never claimed that she was disabled on the basis of seizures. The ALJ also noted that plaintiff married in February 2003, another irrelevant fact in determining whether plaintiff can adjust to other work.

Moreover, plaintiff's allegations that she had fallen twice since her surgery and that she suffered from dizziness are not inconsistent with Dr. Barash's notation that she came to the interview unaccompanied by train. The Second Circuit has stated on numerous occasions that a

---

[4]Footnote 2 to SSR 96-8p provides that the ability to work on a part-time basis can sometimes be grounds to find that an individual is not disabled at step four of the sequential analysis. However, by its very terms, footnote 2 is not relevant in the present case because it is limited to situations where the ALJ has found that an individual is not disabled at step four. Here, the ALJ determined that plaintiff was disabled at step four because she was not able to return to her past work.

claimant "need not be an invalid to be found disabled" under the Social Security Act. *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir. 1988) (quoting *Murdaugh v. Sec'y of Health and Human Servs.,* 837 F.2d 99, 102 (2d Cir. 1988) (claimant who "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" nevertheless is disabled because he could not perform sedentary work)). Here, the ALJ never asked plaintiff when the falls occurred and it is possible they happened after her September 5, 2002 visit with Dr. Barash. It is further possible that plaintiff could travel unaccompanied by train even if she suffered from dizziness because she testified that upon the onset of a dizzy spell, she takes certain safety precautions such as sitting down and "go[ing] to a place to . . . wait it out" even if it means she has to "delay what [she's] about to do." (Admin. R. at 237.) When a disabled person "gamely chooses to endure pain in order to pursue important goals," such as visiting the doctor, "it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." *Nelson v. Bowen,* 882 F.2d 45, 49 (2d Cir. 1989).

Finally, the ALJ failed to consider *all* the evidence regarding plaintiff's subjective complaints. Specifically, the ALJ only considered *some* of the medical evidence from plaintiff's treating physicians and psychiatrists, that which supported his finding of not disabled, and he did not consider plaintiff's own testimony nor that of her husband. The Social Security Regulations provide that a treating physician's report is generally given more weight than other reports if it is "well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Here, plaintiff's treating psychiatrist, Dr. Dalsimer, stated on June 17, 2002, that plaintiff was "clearly both physically and emotionally unable to tolerate a working environment," and on July 9, 2003, that plaintiff was "not ready to resume her

normal activities." (Admin. R. at 196.) Dr. Dalsimer's opinion is not inconsistent with the other medical evidence in the record because Dr. Ertec reached a similar conclusion on November 12, 2002 in stating that, while plaintiff was expected to make a full readjustment to an independent work-related environment, "she had not yet done so." (Admin. R. at 183.) Moreover, plaintiff's husband, Alexander Kriseman, testified that since her surgery, plaintiff suffers headaches "pretty often," and that plaintiff's condition gets worse when she is stressed. (Admin. R. at 248.)

In any event, disregard of plaintiff's subjective complaints, such as headaches lasting for three days at a time, is not justified merely because no objective evidence in support of such complaints exists in the record or because the evidence is inconsistent. *See Marcus,* 615 F.2d at 27. Rather, when a claimant is appearing *pro se*, as was the case here, and the record contains evidence indicating that such an impairment might currently exist, the ALJ has an affirmative obligation to secure additional evidence, or interpretation and explanation of the existing evidence, from the treating source and/or consulting source. *See Ferraris v. Heckler,* 728 F.2d 585, 587 (2d Cir. 1984).

### D. The ALJ Failed to Develop the Record

If the administrative record is incomplete, the essentially non-adversarial nature of a benefits proceeding requires the ALJ to affirmatively develop the record. *See Sharbaugh v. Apfel*, No. 99-CV-277H, 2000 WL 575632, at *3 (W.D.N.Y. Mar. 20, 2000) (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)). Under the regulations, the ALJ must develop plaintiff's "complete medical history" and "make every reasonable effort" to help the plaintiff obtain the required medical reports. 20 C.F.R. § 404.1593. Generally, the ALJ satisfies its duty if it makes (1) an initial request for evidence from a medical source, and (2) if the evidence has not been received within ten to twenty calendar days after the initial request, makes one follow-up request to obtain the medical evidence.

15

*See id.* 20 C.F.R. § 404.1512(d)(1). The regulations also state that, "[w]hen the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e). Furthermore, the ALJ is obligated to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity. *See Devora v. Barnhart*, 205 F. Supp. 2d 164, 173 (S.D.N.Y. 2002).

However, this affirmative duty is heightened when the claimant appears *pro se*, as was the case here. *See Id.* at 172; *see also Cullinane v. Sec'y of Health and Human Servs.*, 728 F.2d 137, 139 (2d Cir. 1984) (remanding for new hearing appropriate where ALJ failed to assist *pro se* litigant in securing all relevant medical testimony)). The ALJ must take all reasonable steps to obtain past and current medical evidence and assessments from treating sources identified by *pro se* plaintiff in order to complete the administrative record. *See Jones v. Apfel*, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999). Reasonable efforts in this context includes more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpeonas to ensure the production of claimant's medical records, obtaining the testimony of necessary witnesses, and advising the plaintiff of the importance of the evidence. *See* 40 U.S.C. § 405(d); *Apfel,* 66 F. Supp. 2d at 539 (citing *Almonte v. Apfel*, 96 Civ. 1119, 1998 WL 150996, at *7 (S.D.N.Y. Mar. 31, 1998)). The ALJ must also enter these attempts at evidentiary development into the record. *See Apfel,* 66 F. Supp. 2d at 539.

Here, the ALJ found plaintiff's subjective complaints that she was unable to work due to symptoms such as headaches and dizziness not credible because they were inconsistent with, and

not supported by, some of the medical evidence. Plaintiff alleges that the ALJ's decision must be reversed, or her case remanded for further administrative proceedings, because the ALJ failed to (1) seek a report or office notes from Melina Kavakov, plaintiff's treating therapist, (2) obtain the missing pages from a report written by plaintiff's treating neurologist, Dr. Elowitz, and (3) request a more detailed statement from plaintiff's treating physician, Dr. Dalismer. The court agrees.

With respect to Ms. Kavakov, the Commissioner contends that she fulfilled her duty by requesting information and records from Ms. Kavakov on or around August 5, 2002. Under the regulations this minimal effort is clearly insufficient. Considering that plaintiff had met with Ms. Kavakov on a weekly basis since 2000, her office records and a report on plaintiff's emotional condition would undoubtedly have aided the ALJ in assessing the validity of plaintiff's subjective complaints. Thus, the ALJ erred in failing to make a follow-up request for the medical evidence, issue a subpeona and advise plaintiff of the importance of the evidence. *See Almonte*, 1998 WL 150996 at *7 ("Possible avenues the ALJ could have pursued included subpeona, enforcement of that subpeona, and advice to the plaintiff of the importance of the evidence.").

The ALJ also erred in failing to obtain the missing pages from Dr. Elowitz's report, dated July 25, 2002, by making a follow-up request or issuing a subpeona. The Administrative Record only contains pages two and seven out of a seven-page report, and is missing pages three through six. (Admin. R. at 159-60.) Dr. Elowitz performed the brain surgery on plaintiff, and as her treating neurologist, is best placed to report on how plaintiff's recovery is progressing, whether she suffers from residuals such as headaches and dizziness, and if her recovery should preclude work activity. This is particularly true given that the ALJ found plaintiff's subjective complaints to lack credibility in part due to Dr. Elowitz's requirement that plaintiff only come in for follow-up visits every five

17

years, Dr. Ertec's opinion that plaintiff's prognosis was good, and the lack of evidence that plaintiff's slow recovery was not to include work activity. If it is necessary to resolve an inconsistency between the opinions of treating sources and other sources, such as plaintiff's own testimony, the ALJ must secure additional evidence and explanation from the treating physician. *See Cruz v. Sullivan,* 912 F.2d 8, 12 (2d Cir. 1990).

Finally, the ALJ failed to advise the *pro se* plaintiff that she should obtain a more detailed statement from her treating psychiatrist, Dr. Dalsimer. Dr. Dalsimer stated in his letter, dated July 24, 2003, notably more than twelve months after plaintiff's surgery, that plaintiff was "not ready to resume her normal activities," and suggested that she was experiencing a posttraumatic reaction to her surgery. (Admin. R. at 196.) However, the ALJ noted in his decision that "there is no evidence that any treating psychologist or psychiatrist has restricted the claimant from performing work activity." (Admin. R. at 18.) Had plaintiff been apprised of the ALJ's skepticism, she, unlike the ALJ, may have been persistent about obtaining a more detailed statement from Dr. Dalsimer regarding the her capacity to work full-time.

The ALJ also appeared to downplay the significance of Dr. Dalsimer's opinion based on plaintiff's reluctance to accept a prescription of Celexa. The ALJ stated that "claimant's reluctance to accept a 'trial' of Celexa indicates that the signs and symptoms witnessed by Dr. Dalsimer on July 24, 2003 may have been absent [due to] prescribed medication therapy." (Admin. R. at 18.) Under the regulations, a claimant may be denied disability benefits if the Secretary finds that she unjustifiably failed to follow prescribed treatment and that, if she had followed the treatment, she would not be disabled under the Act. *See McFadden v. Barnhart,* No. 94 Civ. 8734, 2003 WL 1483444, at *23 (S.D.N.Y. 2003); 20 C.F.R. § 404.1530; SSR 82-59. Before a finding of

noncompliance can be made, however, certain procedural safeguards must be met. For instance, the ALJ must provide claimant with notice of the effect of noncompliance on her application for benefits, occasion to explain any seeming noncompliance, and an opportunity to undergo the prescribed treatment. SSR 82-59. Given that the ALJ in the instant action failed to satisfy these procedural requirements, he lost the ability to assert it as a reason for denying disability benefits. *See Grubb v. Apfel,* No. 98 Civ. 9032, 2003 WL 23009266, at *5 (S.D.N.Y. 2003); SSR 82-59.

### III. Conclusion

The Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975). Consistent with that view, "courts have not hesitated to remand for the taking of additional evidence, on good cause shown, where relevant, probative and available evidence was either not before the Secretary or was not explicitly weighed and considered by him, although such consideration was necessary to a just determination of a claimant's application." *Id.* Plaintiff, appearing *pro se* in the administrative proceeding, did not have a full and adequate hearing under the Commissioner's regulations. Since counsel now represents plaintiff, it is likely that the unexplored information discussed above will be pursued.

Accordingly, this case is remanded to the Commissioner for further evidentiary proceedings. To prevent delay in the processing of plaintiff's case, further proceedings before the ALJ must be completed within sixty days of the issuance of the order, i.e. by May 8, 2007; if plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty days of plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 388 (2d Cir. 2004) (suggesting procedure and time limits to ensure speedy disposition of Social Security cases following remand by a district

court). "[I]f these deadlines are not observed, a calculation of benefits owed [to plaintiff, Amy Emery] must be made immediately." *Id.*

Upon remand, the Commissioner should explore with more precision plaintiff's subjective complaint that she suffers from headaches three times a month lasting three days at a time and whether such an impairment would prevent her from adjusting to other work which exists in the national economy. Specifically, the Commissioner should obtain further information from plaintiff's treating therapist, Melina Kavakov, plaintiff's treating neurologist, Dr. Elowitz, and plaintiff's treating psychiatrist, Dr. Dalsimer. Considering that plaintiff's condition has improved over time, the Commissioner should also consider whether a closed period of benefits is appropriate.

SO ORDERED.

DATED:     Brooklyn, New York
               March 8, 2007

                                            _____/s/_____
                                                    DORA L. IRIZARRY
                                               United States District Judge